UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
"THE YOUNGBLOODS" (Perry Miller p/k/a                    :
Jesse Colin Young; Lowell Levinger; Jerry Corbitt
Mina Bauer, the widow of Joe Bauer; and manager          :
Stuart Kutchins), ON BEHALF OF ITSELF
AND ALL OTHERS SIMILARLY SITUATED,                       :         **AMENDED**
                                                                  **MEMORANDUM AND ORDER[1]**
                                                         :
                    Plaintiff,                                     07 Civ. 2394 (GBD)(KNF)
                                                         :
               -against-
                                                         :
BMG MUSIC,[2]
                                                         :
                                                         :
                    Defendant.                           :
------------------------------------------------------------------X
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

On March 23, 2007, plaintiff "'THE YOUNGBLOODS' (Perry Miller p/k/a Jesse Colin

Young; Lowell Levinger, Jerry Corbitt, Mina Bauer, the widow of Joe Bauer, and manager

Stuart Kutchins), ON BEHALF OF ITSELF AND ALL OTHERS SIMILARLY SITUATED,"

commenced this class action, for breach of contract and a declaratory judgment against "SONY

BMG MUSIC ENTERTAINMENT, A Delaware General Partnership," for failure to account

properly and pay for digital music download and mobile phone ringtone royalties.  Subsequently,

the plaintiff amended the complaint and replaced the defendant with "BMG MUSIC" ("BMG").

Before the Court is BMG's motion to stay the proceedings and for leave to amend its answer,

pursuant to Federal Rule of Civil Procedure 15(a)(2).

_____

[1] This Amended Memorandum and Order supersedes the November 9, 2010
Memorandum and Order, Docket Entry No. 73.

[2] The Clerk of Court is directed to amend the caption in this action to reflect the name of
the defendant in the second amended complaint.

## BACKGROUND

On August 15, 1966, BSM Music Productions, Inc. ("BSM"), entered into an agreement with BMG's predecessor, Radio Corporation of America Records, RCA Victor Record Division, to furnish the personal services of Perry Miller, p/k/a Jesse Colin Young, Joe Bauer, Jerry Corbitt and Lowell Levinger, p/k/a The Youngbloods, for the purpose of recording and making records.  On September 1, 1995, to resolve a lawsuit, entitled <u>The Youngbloods v. Bertelsmann Music Group, Inc.</u>, Civil Action No. C95 2054 VRW, regarding royalties under the 1966 agreement, a settlement agreement was reached "by and among PERRY MILLER, p/k/a JESSE COLIN YOUNG, LOWELL LEVINGER and JERRY CORBITT, constituting the surviving members of the band formerly known as THE YOUNGBLOODS, a California unincorporated association ("The Youngbloods"); HERBERT S. GART, as successor in interest to BSM MUSIC PRODUCTIONS, INC. ("Gart"); and BMG MUSIC, d/b/a THE RCA RECORDS LABEL, as successor in interest to Radio Corporation of America (RCA Record Division[])] ("RCA")."  The 1995 settlement agreement resolved the dispute among the parties "regarding The Youngbloods' entitlement to revenues from the licensing by RCA of sound recordings by the Youngbloods for use in movies, television and advertising (hereinafter sometimes referred to as 'master use licensing')," prior to and including the date of the agreement.  As consideration for the settlement agreement, BMG paid money, and, as part of the consideration for the settlement agreement, The Youngbloods and Gart made certain representations and warranties, including the following:

> (a) Perry Miller, p/k/a Jesse Colin Young, Lowell Levinger and Jerry Corbitt are the surviving members of the band formerly known as The Youngbloods, and

each of them has full right and authority to enter into this Agreement and the Amendment being executed contemporaneously herewith.

      (b) No other person or entity, including, without limitation, BSM Productions, Inc. and William Morris Agency, Inc., or either of them, has any right, title or interest, or any other claim, in or to any of the revenues payable to The Youngbloods under this Agreement or under the Amendment to be executed contemporaneously herewith.

*   *   *

      (d) Joe Bauer, a former member of The Youngbloods and a participant in the creation of the Masters, is deceased.  Any and all rights and interests of Mr. Bauer to revenues from the use of the Masters have descended to Mr. Bauer's widow, Mina Bauer, who expressly disclaims any interest in the proceeds of the use of the Masters as set forth in this Agreement and in the Amendment.

Contemporaneously to making the 1995 settlement agreement, an amendment to the 1966 agreement ("the 1995 amendment") was signed between BMG and Perry Miller, p/k/a Jesse Colin Young, Lowell Levinger and Jerry Corbitt, "individually and collectively p/k/a 'The Youngbloods,'" providing, *inter alia*, the following paragraph ("Paragraph 2"):

      2. The following text shall be added to the end of subparagraph 4(a) of the [1966] Agreement:  "If RCA receives income from the use of Master Recordings hereunder in synchronization with motion picture or television soundtracks or in Videos (as hereinafter defined) thereof, or if RCA licenses the use of any Master Recording hereunder on a flat fee or cent-rate basis, RCA shall accrue and additional royalty hereunder of fifty (50%) percent of the net amount of such income so received by RCA."

In recent years, a new method of commercial exploitation of recorded music, known as music download services, has developed, which does not require the manufacture or distribution of physical records.  According to the plaintiff, the music download services provider companies, including Apple, Buy.com. Liquid Digital Media (Walmart.com), Zune, Rhapsody/Urge, Music Net and Napster, have obtained licenses from the major record companies, such as BMG, authorizing them to distribute, via digital downloads, each of their

3

respective catalogues of master recordings.  Using music download services, customers pay a fee to download a copy of a master recording in the form of a digital audio file, copying the file from the music download provider to the consumer's personal digital storage device.  Some music download providers, such as Apple's iTunes, charge 99 cents for a single musical track that the consumer may store on a maximum of five authorized devices, such as an iPod.  Other music download providers, such as Napster, operate a subscription service that allows consumers to download musical performances for a set monthly fee, enabling them to play the musical performances, contingent upon the consumer's continuing payment of the monthly subscription charge.  The plaintiff alleges that, for example, of the 99 cents charged to consumers, by Apple, for each music download, The Youngbloods receive approximately 4.7 cents, when they should receive in excess of 30 cents.

Mobile phone ringtones and ringbacks represent another method through which music recordings are licensed.  A master ringtone is a portion of a master recording converted into a digital file that consumers download directly to their mobile phones to customize the sound of the phone when they receive a call, paying between $1 and $3 per ringtone downloaded. Similarly, a master ringback is a portion of a master recording digitally converted into a file downloaded by the consumers on their mobile phones to customize the sound they hear when placing a call, which costs between $1 and $3 per downloaded ringback.  Consumers purchase mobile phone ringtones and ringbacks from ringtone providers, including mobile phone companies, such as AT&T, Wireless, Sprint, T-Mobile and Verizon Wireless.  These companies license master recordings directly from record companies or content owners, or from aggregators who license master recordings from record companies and content owners and convert those recordings into various digital formats.  According to the plaintiff, ringtone providers have

4

obtained licenses from major record companies, such as BMG, authorizing them to distribute

and sell master ringtones and ringbacks.

The plaintiff alleges BMG failed to render to it and other artists accurate accounting

statements and to account for and credit properly royalties for digital music download and

mobile phone ringtone and ringback uses, during the period between January 1, 1962, through

December 31, 2002, generated by BMG's licensing of the plaintiff's and other class members'

master recordings to the third-party licensees.  BMG maintains that, in August 2010, while

conducting depositions, it learned, for the first time, that the representations and warranties made

to it by the 1995 settlement agreement signatories were false when made.  On August 23, 2010,

BMG commenced an action in the United States District Court for the Northern District of

California for, *inter alia*, rescission and breach of the 1995 settlement agreement and the 1995

amendment.  On August 31, 2010, the defendant filed this motion to stay the proceedings and for

leave to amend its answer.

## MOTION TO STAY THE PROCEEDINGS

### *Legal Standard*

> [T]he power to stay proceedings is incidental to the power inherent in every court to
> control the disposition of the causes on its docket with economy of time and effort
> for itself, for counsel, and for litigants.  How this can best be done calls for the
> exercise of judgment, which must weigh competing interests and maintain an even
> balance.

Landis v. N. Am. Co., 299 U.S. 248, 254-55, 57 S. Ct. 163, 166 (1936).  "The decision whether

or not to stay . . . a proceeding rests within a district judge's discretion."  Adam v. Jacobs, 950

F.2d 89, 92 (2d Cir. 1991).

> [The party moving] for a stay must make out a clear case of hardship or
> inequity in being required to go forward, if there is even a fair possibility that the
> stay for which he prays will work damage to some one else.  Only in rare

circumstances will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both. Considerations such as these, however, are counsels of moderation rather than limitations upon power. . . .

. . . We must be on our guard against depriving the processes of justice of their suppleness of adaptation to varying conditions. Especially in cases of extraordinary public moment, the individual may be required to submit to delay not immoderate in extent and not oppressive in its consequences if the public welfare or convenience will thereby be promoted. . . .

. . .The stay is immoderate and hence unlawful unless so framed in its inception that its force will be spent within reasonable limits, so far at least as they are susceptible of prevision and description. When once those limits have been reached, the fetters should fall off. To put the thought in other words, an order which is to continue by its terms for an immoderate stretch of time is not to be upheld as moderate because conceivably the court that made it may be persuaded at a later time to undo what it has done.

Landis, 299 U.S. at 255-57, 57 S. Ct. at 166-67.

In determining whether to stay a civil action, pending resolution of a concurrent civil action in federal court, the courts in this district usually consider the following factors: "(1) the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed; (2) the private interests of and burden on the defendants; (3) the interests of the courts; (4) the interests of persons not parties to the civil litigation; and (5) the public interest." Kappel v. Comfort, 914 F. Supp. 1056, 1058 (S.D.N.Y. 1996) (citing Volmar Distribs. v. New York Post Co., 152 F.R.D. 36, 39 (S.D.N.Y. 1993)); see LaSala v. Needham & Co., 399 F. Supp. 2d 421, 427 (S.D.N.Y. 2005); Am. S.S. Owners Mut. Prot. & Indem. Ass'n v. LaFarge N. Am., Inc., 474 F. Supp. 2d 474, 482 (S.D.N.Y. 2007); but see Cord v. Prudential-Bache Sec., Inc., No. 91 Civ. 1477(MBM), 1991 WL 158940, at *1 (S.D.N.Y. Aug. 13, 1991) (staying civil action pending resolution of a related class action in federal district court in Illinois and applying relevant factors: "whether staying the proceeding

will result in judicial economy or will avoid duplication of effort, whether the other proceeding is at a more advanced stage, and whether if this action is stayed, the plaintiff will have her 'day in court' in the parallel proceeding.") (quoting Private Med. Care Found., Inc. v. Califano, 451 F. Supp. 450, 452-53 (W.D. Okla. 1977)).  These five factors noted above were originally formulated in order to determine a motion by defendants to stay numerous civil antitrust cases, pending the disposition of a parallel criminal antitrust case.  See Golden Quality Ice Cream Co. v. Deerfield Speciality Papers, Inc., 87 F.R.D. 53, 55-56 (E.D. Pa. 1980).  When it "broadly stated" these five principal factors, the Golden Quality Ice Cream Co. court was specifically addressing the defendants' concerns that "the burden of civil discovery and motion practice would seriously hamper them in their preparations for the criminal proceeding," and that "civil discovery would pose the danger of intruding on the Fifth Amendment rights of the several individuals who are defendants in the criminal (albeit not in the civil) proceeding."  Id. at 55. The court also noted that its "canvas of competing interests is not intended to be exhaustive."  Id. However,"when deciding a motion to stay proceedings pending the resolution of another action in federal court," the courts in the Third Circuit consider: "(1) the promotion of judicial economy; (2) the balance of harm to the parties; and (3) the duration of the requested stay." Metal Munchers, LLC v. Shah, No. 2008-CV-0043, 2008 WL 5082831, at *1 (D. V.I. Nov. 25, 2008); see Ciolli v. Iravani, Civil Action No. 2:08-cv-02601, 2008 WL 4412053, at *2 (E.D. Pa. Sept. 24, 2008).

Constitutional or certain other concerns implicated in criminal proceedings are generally not present where a motion to stay a civil action involves a concurrent federal civil action.  In determining whether to exercise its discretion and stay this action, pending the resolution of the action in the California district court, the Court has considered the following factors: (1) the

7

promotion of judicial economy; (2) the balance of harm to the parties; (3) the duration of the requested stay; and (4) other pertinent factors specific to the circumstances of this case.  See Landis, 299 U.S. at 256, 57 S. Ct. at 166 ("An application for a stay in suits . . . weighty and unusual will not always fit within the mould appropriate to an application for such relief in a suit upon a bill of goods.").

***Application of Legal Standard***

*(1) Promotion of Judicial Economy*

The defendant argues that staying this action "will avoid wasting the resources of the parties and the Court on potentially moot claims," including "extraordinarily costly discovery regarding whether a class of plaintiffs should be certified in this action."  According to the defendant, a "judgment that BMG properly has rescinded the 1995 Amendment, however, would moot Plaintiff's lawsuit.  Plaintiff's claims are predicated entirely on Paragraph 2 of the 1995 Amendment . . . .  Thus, resolving the merits of rescission before delving into the intricacies of contractual interpretation, the custom and practice of the recording industry, and class certification would spare the parties and the Court from researching, briefing, and deciding complex issues that may be rendered entirely unnecessary by a simple ruling on rescission."

The plaintiff contends that, because "there is a parallel action"[3] before the Court, "[s]taying [T]he Youngbloods action will not appreciably change the impact on this Court, which will have to consider the merits of substantially identical claims regardless of the outcome in the California Action."  According to the plaintiff, BMG's counsel is in the process of drafting a motion for summary judgment, in both this and the Shropshire action, and all agreements with

---

[3] Allman, et al. v. Sony BMG Music Entertainment, Inc., No. 06 Civ. 3252 (GBD)(KNF). Presently, the named plaintiff in this related class action is Elmo Shropshire.

8

download providers since 2006 "apply equally to the Shropshire and Youngbloods classes."  In addition, BMG "has even already proffered expert reports on several extrinsic issues" and "[t]hose expert opinions are captioned with both case names and apply equally to both." Moreover, even if the defendant prevails in the California action, "the class action would proceed anyway" because "counsel should be easily able to find a substitute named plaintiff," given that there are "likely thousands of artists with identical licensing provisions in their recording contracts with [the defendant]."

Discovery in this action and Allman, et al. v. Sony BMG Music Entertainment, Inc., No. 06 Civ. 3252 (GBD)(KNF), see footnote 1, closed on August 13, 2010.  Upon the resolution of the instant motion and the defendant's pending motion for sanctions in the Allman action, which will be resolved in short order, the parties' dispositive motions are due.  In light of the fact that the two related actions contain identical claims against the defendants for breach of contract concerning royalties for digital downloads leased to music download service providers and mobile phone ringtone and ringback providers, the outcome of the California action is irrelevant to the Court's obligations to manage its cases and use judicial resources efficiently.  The thrust of the defendant's argument is that, according to California law governing its action for rescission, "[t]here is . . . no question that the misrepresentations justify rescission of the 1995 Settlement Agreement and the 1995 Amendment."  However, the possibility of success on the merits is not a factor that courts consider when determining whether to stay a civil action pending the resolution of a concurrent civil action in federal court.  Cf. Hirschfeld v. Bd. of Elections in the City of New York, 984 F.2d 35, 39 (2d Cir. 1993) ("In this Circuit, four factors are considered before staying the actions of a lower court: . . . (3) whether the movant has demonstrated a substantial possibility, although less than a likelihood, of success on appeal . . .")

9

(internal quotation marks omitted).  Thus, it is not appropriate for the Court to decide the instant motion based on the speculative assertions of the defendant that, if it prevails in the California federal district court, the instant action would be moot.

Whatever the outcome of the California case, its resolution would not remove from the Court's docket the related <u>Allman</u> class action, in which: (i) identical claims are asserted against the defendant in <u>Allman</u> as in the instant action; (ii) the same attorneys are involved as in the instant action; and (iii) certain resources have already been and will be used in both cases.  In resolving dispositive motions in both actions and moving forward, the Court will need to address similar, if not identical, questions of fact and law that will be presented in both actions. According to the plaintiff's counsel, the summary judgment motion in this action and that in the <u>Allman</u> action "are identical in several respects," including that "[e]ntire sections of each motion are repeated verbatim."  Promoting judicial economy involves not only the Court's ability to control the disposition of the cases on its docket "with economy of time and effort for itself," but also "for counsel, and for litigants."  <u>Landis</u>, 299 U.S. at 254, 57 S. Ct. at 166.  Consequently, the pendency of the California federal district court action, related solely to the plaintiff in the instant case, will not have a substantial impact, regardless of its outcome, on the Court's management of the related <u>Allman</u> class action.  In fact, because the instant and the <u>Allman</u> actions are substantially similar, the mere possibility that the substantial amount of work the Court and counsel would undertake going forward in the <u>Allman</u> action would need to be undertaken again in the instant action, undermines the principle of judicial economy.  Judicial economy, which encompasses the interests of all actors involved, will be promoted by the Court's managing both actions simultaneously.  Therefore, the promotion of  judicial economy factor militates against the stay.

*(2) The Balance of Harm to the Parties*

The defendant contends that, absent the stay, the burden imposed on it will be significant because "this Court would be called upon to resolve the question of whether BMG has validly rescinded the 1995 Amendment," and the Court's determination "likely would not be binding on the actual signatories to the 1995 Amendment." According to the defendant, "in order to achieve complete relief, BMG likely *still* would be required to litigate the issue against those signatories in the Northern District of California;" thus, "denial of a stay would saddle BMG . . . with duplicative litigation and prejudice BMG by exposing it to the risk of inconsistent judgments." On the other hand, the defendant claims, the plaintiff will suffer no prejudice from a stay, because the relief it seeks is monetary in nature, and "any prejudice resulting from a delay in judgment can be remedied through an award of pre-judgment interest."

The plaintiff argues that its interest is in "the expeditious resolution of this long pending class action," and it would be unfairly prejudiced by a stay. According to the plaintiff, "it is obvious that Defendant's sole purpose in filing its frivolous lawsuit in California is to delay the resolution of the merits of the claim in this action." Furthermore, because the next phase in this action, after dispositive motions are resolved, is class certification, a stay "will also unfairly prejudice the thousands of putative class members and the public interest." Putative class members will not be given notice of the issues pending in this action until a class is certified and, "[a]s a result, recording artists may settle audit claims with [the defendant] or be otherwise 'picked off' without realizing that this pending action could substantially affect their rights to licensing royalties. A stay could also affect the general public to the extent that a decision in the class action could ultimately change the prices or licensing on digital downloads." The plaintiff has brought to the Court's attention a recent Ninth Circuit case, F.B.T. Prods., LLC v. Aftermath

11

Records, Nos. 09-55817, 09-56069, 2010 WL 3448098 (9th Cir. 2010), concerning the

percentage of royalties due the plaintiffs in that action, from the sale of permanent downloads

and mastertones of the recordings of Marshal B. Mathers, III, p/k/a Eminem.  In that case, the

agreement between the plaintiffs and the defendants provides that "F.B.T. is to receive 50% of

Aftermath's net receipts '[o]n masters licensed by us . . . to others for their manufacture and sale

of records or for any other uses.'"  Id. at *1.  The Ninth Circuit held that the agreement provided

unambiguously that the defendants owed the plaintiffs "a 50% royalty under the Masters

Licensed provision for licensing the Eminem masters to third parties for any use."  Id. at *7.

Thus, the plaintiff argues, in light of the Ninth Circuit case, and "[g]iven that there [are] likely

thousands of artists with identical licensing provisions in their recording contracts," any further

delay would prejudice class members in this action, even if the named plaintiff here would have

to be substituted.

     The harm to the defendant resulting from the possibility of facing: (a) duplicative

litigation in the California federal district court, on the issue of "whether BMG has validly

rescinded the 1995 Amendment"; and (b) inconsistent judgments, must be balanced against the

harm to the plaintiff, resulting from the unnecessary delay in and the inability to obtain

expeditious resolution of this already protracted litigation, which, it is alleged, will prejudice the

plaintiff and the putative class members unfairly.  The parties' submissions on this motion

demonstrate the following: (a) the plaintiff in this action is The Youngbloods, "an

unincorporated association with its principal place of business in Marin County, California;" (b)

the 1995 Settlement Agreement was reached in the case entitled "The Youngbloods v.

Bertelsmann Music Group, Inc., Civil Action No. C95 2054 VRW;" (c) the section of the 1995

settlement agreement entitled "Mutual, General Release," provides, inter alia, that "[i]n

consideration of the promises set forth herein, The Youngbloods and Gart, on the one hand, and

RCA, on the other hand" release and discharge each other from any and all claims in connection

with the 1995 action; (d) the section of the 1995 settlement agreement entitled "Representations

and Warranties," provides, *inter alia*, that "[a]s part of the consideration for this Agreement, The

Youngbloods and Gart represent and warrant as follows . . .;" and (e) one of the defendants in

the California federal district court case is "The Youngbloods Company . . . a California

partnership."  The record on this motion appears to undermine the defendant's assertion that

"'The Youngbloods' ('Plaintiff') was not a party to any of the agreements at issue," or that

plaintiff The Youngbloods here is not defendant The Youngbloods in the California federal

district court action.  Thus, it is not clear, at least with respect to The Youngbloods, that a

decision by the Court on the question of rescission would not be binding on BMG's successor,

Arista (the plaintiff in the California action), and "The Youngblood Company" (the defendant in

the California action) in the California federal district court.  See generally, Taylor v. Sturgell,

553 U.S. 880, 128 S. Ct. 2161 (2008) (discussing the doctrine of res judicata and the exceptions

to the rule against nonparty preclusion); see 28 U.S.C. § 1963.  The defendant has not

demonstrated to the Court: (a) what the legal relationship, if any, is between the individuals

sharing revenues received by The Youngbloods on one hand and The Youngbloods on the other

hand; or (b) what the relevance of that relationship, if any, is to this action or to the California

federal district court action.  Thus, the uncertainty of the impact of any decision made in this

action respecting the rescission issue on the California district court undermines the defendant's

claim of harm resulting from duplicative litigation and the possibility of inconsistent judgments.

Balanced against that uncertainty is the harm resulting from the plaintiff's certain interest, as

well as the putative class members' interest, in the expeditious resolution of this litigation, now

in its fourth year.  The Court finds that the balance of harm tips in favor of the plaintiff.  See Landis, 299 U.S. at 254-55, 57 S. Ct. at 166.

### (3) The Duration of the Requested Stay

Given that the California action was filed on August 23, 2010, it is uncertain how long it will last and when it will be decided.  The defendant submitted no evidence to the Court to show, for example, what the general time range is for disposing of similar cases by the California federal district court.  "An order which is to continue by its term for an immoderate stretch of time is not to be upheld as moderate . . . ."  Landis, 299 U.S. at 257, 57 S. Ct. at 167. Therefore, absent any evidence about the duration of the requested stay, this factor weighs heavily against the defendant.

### (4) Any Other Pertinent Factor Specific to the Circumstances of This Case

The plaintiff's argument, that "a stay could also affect the general public to the extent that a decision in the class action could ultimately change the prices or licensing on digital downloads," implicates public interest, not only of the artists in the music and music-related industries, but also of the consuming public.  The Court finds that the public interest implicated by this putative class action will not be promoted by granting a stay.  See Landis, 299 U.S. at 256, 57 S. Ct. at 166.

This is not one of those rare circumstances in which a litigant should "be compelled to stand aside while a litigant in another [cause] settles the rule of law that will define the rights of both."  Id. at 255, 57 S. Ct. at 166.  Based on the foregoing considerations, the Court finds that the defendant failed to establish a clear case of hardship or inequity in being required to go forward.  The defendant's motion to stay the proceedings is denied.

14

## MOTION FOR LEAVE TO AMEND THE ANSWER

*Legal Standard*

"The purpose of pleading is to facilitate a proper decision on the merits." United States

v. Hougham, 364 U.S. 310, 317, 81 S. Ct. 13, 18 (1960) (citation omitted).  Once the time for

amending the pleadings, as a matter of course, expires, "a party may amend its pleading only

with the opposing party's written consent or the court's leave.  The court should freely give

leave when justice so requires." Fed. R. Civ. P. 15(a)(2).  "Leave to amend, though liberally

granted, may properly be denied for: 'undue delay, bad faith or dilatory motive on the part of the

movant, repeated failure to cure deficiencies by amendments previously allowed, undue

prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment,

etc.'" Ruotolo v. City of New York, 514 F.3d 184, 191 (2d Cir. 2008) (quoting Foman v. Davis,

371 U.S. 178, 182, 83 S. Ct. 227 (1962)). "The burden to explain a delay is on the party that

seeks leave to amend." MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc., 157 F.3d 956, 962 (1998).

"The rule in this Circuit has been to allow a party to amend its pleadings in the absence

of a showing by the nonmovant of prejudice or bad faith." Block v. First Blood Assocs., 988

F.2d 344, 350 (2d Cir. 1993).  "The longer the period of an unexplained delay, the less will be

required of the nonmoving party in terms of a showing of prejudice." Evans v. Syracuse City

Sch. Dist., 704 F.2d 44, 47 (2d Cir. 1983) (alteration and citation omitted).  "[P]rejudice to the

opposing party, not the diligence of the moving party, is the crucial factor in determining

whether or not to grant leave to amend." Smith v. Costa Lines, Inc., 97 F.R.D. 451, 453 (N.D.

Cal. 1983) (rejecting the defendant's argument that leave to amend the complaint to add a new

defendant should be denied because the plaintiff's action is barred by the statute of limitations

and the plaintiff knew or should have known the identity of the new defendant when the action was filed).  A court may "deny leave to amend where the motion is made after an inordinate delay, no satisfactory explanation is offered for the delay, and the amendment would prejudice the [nonmovant]."  Cresswell v. Sullivan & Cromwell, 922 F.2d 60, 72 (2d Cir. 1990).

In determining prejudice, courts consider whether the proposed amendment would: "(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the [movant] from bringing a timely action in another jurisdiction."  Block, 988 F.2d at 350.

> "One of the most important considerations in determining whether amendment would be prejudicial is the degree to which it would delay the final disposition of the action.  Furthermore, '[a] proposed amendment . . . [is] especially prejudicial . . . [when] discovery has already been completed and [non-movant] had already filed a motion for summary judgment.'"

Krumme v. Westpoint Stevens Inc. 143 F.3d 71, 88 (2d Cir. 1998) (citations omitted).

"Mere delay, however, absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend."  State Teachers Ret. Bd. v. Fluor Corp., 654 F.2d 843, 856 (2d Cir. 1981).

The nonmovant has the burden of showing that the proposed amendment would be futile.  See 6 Charles Alan Wright & Arthur Miller, federal Practice and Procedure §1473 (3d ed. 2010).  "An amendment to add an affirmative defense is futile when 'the proposed affirmative defense is not a defense to liability,' that is, 'when the proposed affirmative defense lacks a sound basis in law. . . .'"  In re Currency Conversion Fee Antitrust Litig., 264 F.R.D. 100, 118 (S.D.N.Y. 2010) (citation omitted).  While not much case law exists in this Circuit about what constitutes bad faith for the purpose of denying a motion for leave to amend a pleading, "[a] finding that a party is seeking leave to amend solely to gain a tactical advantage, . . .

16

supports a finding that such an amendment is made in bad faith." <u>Oneida Indian Nation of N.Y.</u> <u>State v. County of Oneida</u>, 199 F.R.D. 61, 80 (N.D.N.Y. 2000).  "A decision to grant or deny a motion to amend is within the sound discretion of the trial court."  <u>Krumme</u>, 143 F.3d at 88.

***Application of Legal Standard***

*Delay*

The defendant argues that the motion to amend its answer is timely because, "[o]nly after BMG deposed Plaintiff's corporate representative on August 3, 2010, as well as Plaintiff's fact witness on August 4 and August 10, 2010, did it become clear that the representations made by Miller, Levinger, Corbitt, and Gart in Paragraph 4 of the 1995 Settlement Agreement were false and either knowingly or recklessly made for the purpose of inducing BMG to enter into the 1995 Settlement Agreement and the 1995 Amendment."  According to the defendant, it "tendered its notice of rescission, commenced the California Action, and filed its motion for leave to amend all within four weeks of first learning that the representations contained in the 1995 Settlement Agreement were false."

The plaintiff contends the defendant "unduly delayed in seeking to amend its Answer" because it "was aware of the basis for its current amendment at least 7 years before this case was filed."  Alternatively, the defendant "was unquestionably aware [of the basis for its amendment] at the latest, in November 2009, when Plaintiff produced documents in response to [the defendant's] First Request for Production of Documents," which included: (i) "a 1969 contract showing that Herb Gart was entitled to a commission on the Youngbloods' revenues;" and (ii) "letters from 2000," which reflected that, "in addition to the original band members, Stuart Kutchins and Mina Bauer had a right, title and interest in or to the revenues payable to the Youngbloods under the RCA recording agreement."  The defendant waited "10 months, to the

17

eve of the summary judgment motion, to file this request to amend," and it has "no reasonable justification for this delay in filing."

The defendant counters by arguing that the issue is not "whether other persons were later identified to BMG as having an interest in [the Youngbloods'] revenues, but whether BMG learned that those persons had an interest at the time the Settlement Agreement was executed in 1995, such that the representations and warranties in the 1995 Settlement Agreement were false when made," and "the 2000 letters say nothing about who had what interest at the time the 1995 Settlement Agreement was executed."

In support of its motion for leave to amend the answer to add the affirmative defense of rescission of the 1995 amendment, the defendant submitted transcript excerpts from the deposition testimony of: (a) Stuart Kutchins, stating his understanding that it does not appear that the representations made in the 1995 settlement agreement were accurate at that time because they omit his and Mina Bauer's interests in the revenues payable to The Youngbloods, under the 1995 amendment; (b) Lowell Levinger, stating that, at the time of the 1995 amendment, Herb Gart had an interest in the revenues payable to The Youngbloods; (c) Thomas Cohen, the attorney representing The Youngbloods in 1995, stating that, "with regard to Mina Bauer," he was "not aware of any facts that would support the representation in [the 1995 Settlement Agreement];" and (d) Jesse Colin Young, stating that when he signed the 1995 Settlement Agreement, "[n]o one explained to [him] that Mina . . . disclaims any interest."  In opposition to the defendant's motion to amend, the plaintiff submitted correspondence from 2000, respecting the 1997 settlement agreement between the defendant and Jesse Colin Young, Mina Bauer, Lowell Levinger and Stuart Kutchins, settling a dispute concerning royalty accountings rendered through  February 29, 1996, which indicates that the defendant was aware that Mina Bauer and

Stuart Kutchins had royalty interests in The Youngbloods' revenue in 1997.  However, as the defendant contends, the 2000 correspondence does not show what understanding the signatories to the 1995 settlement agreement and the 1995 amendment had or that the defendant was aware, in 1995, what the signatories' understandings were.  The 2000 correspondence, which could have prompted the defendant to inquire about the inconsistencies between the 1995 amendment and the 1997 amendment, with respect to royalty rights in connection with The Youngbloods' revenues, may suggest a lack of diligence on the defendant's part, but this is not a crucial factor in determining the motion to amend the answer.  See Smith, 97 F.R.D. at 453.  The evidence, submitted by the defendant on this motion, showing that the defendant discovered certain facts through the above-mentioned deposition testimony of the plaintiff's witnesses, provides a satisfactory explanation that the delay in filing the instant motion, four weeks after the depositions in question, was not undue or inordinate.

*Prejudice*

The plaintiff contends that permitting "an amendment would unfairly prejudice Plaintiff. If such an affirmative defense had been timely plead, Plaintiff would have had an opportunity to seek discovery from [the defendant] concerning [the defendant's] years-long knowledge of the facts underlying the purported misrepresentations complained of in the California Action."  The defendant contends that the plaintiff cannot show prejudice because "the chain of title to the interests in the 1966 Recording Agreement has been a subject of discovery in light of BMG's defense of lack of standing; the timing of BMG's amendment is a function of Plaintiff's own conduct; and any delay in a potential recovery by Plaintiff is remedied through prejudgment interest."

19

Although discovery has closed, any additional discovery in connection with the affirmative defense of rescission would be limited in terms of the scope and time. The plaintiff has not shown that limited discovery, if any, undertaken in connection with the defendant's amended answer, would either require it to expend significant additional resources or delay the litigation significantly.  Considering that, at this time, summary judgment motions have not been made, discovery respecting the issue of class certification is to be completed in March 2011, and no trial date has been set, it does not appear that a short delay, if any, to permit relevant discovery solely on the affirmative defense of rescission, would be prejudicial to the plaintiff. The Court finds that the plaintiff has failed to meet its burden of showing that prejudice would result from the amendment of the defendant's answer.

*Futility*

The plaintiff contends that "the proposed amendment is futile, given that the rescission claim is clearly time-barred."  According to the plaintiff, the applicable statute of limitations, for rescission of a written contract, pursuant to California Code of Civil Procedure § 337, is four years and, "the time begins to run when the allegedly aggrieved party discovers the facts constituting the fraud or mistake."  The defendant "undoubtedly knew that other individuals were receiving revenue from the Youngbloods even at the time the 1995 contract was entered into.  But even if it were not aware of that fact then, [the defendant] unquestionably became aware of it in 2000–over 10 years ago–well beyond the statute of limitations."  The defendant argues its motion to amend is not futile because "California law permits rescissions based on mistake, fraud, and failure of consideration, Cal. Civ. Code § 1689, the factual bases for which are all alleged with specificity in Paragraphs 73 to 91 of BMG's proposed Amended Answer."

The Court is not convinced, based on the parties' submissions on this motion, that the proposed affirmative defense of rescission is futile because it has no basis in law. As discussed above, it is not clear from the submissions on this motion, whether and when the defendant was aware that, as the plaintiff suggests, "other individuals were receiving revenue from the Youngbloods" at the time of the 1995 amendment. Without more, the plaintiff cannot sustain its burden of showing that the proposed amended answer is futile.

*Bad Faith*

The plaintiff contends "the filing of the California Action, and the instant move to amend, reeks of a bad-faith and vexatious attempt to delay the Court's resolution of Plaintiff's claims in both this action and the Shropshire action." The defendant claims its motion for leave to amend was made in good faith.

A mere assertion of the plaintiff, that the defendant acted in bad faith when it filed its action in the California federal district court, is not sufficient to demonstrate bad faith on the part of the defendant in filing the instant motion to amend its answer. As mentioned above, limited discovery, if any, will not delay the litigation significantly in this or the related case and, without more, the Court is not convinced that the defendant is seeking leave to amend its answer solely to gain a tactical advantage.

Based on the above considerations, the Court finds that the delay in filing the proposed amended answer is justified, and the plaintiff failed to show prejudice, bad faith or futility of the proposed amended answer. Accordingly, the defendant's motion, for leave to file an amended answer, is granted.

**CONCLUSION**

For the foregoing reasons, the defendant's motion to stay the proceedings is denied and

the defendant's motion for leave to file an amended answer is granted.  This memorandum and

Order resolves the motion, Docket Entry No. 61.

Dated: New York, New York                          SO ORDERED:
        January 6, 2011

                                          KEVIN NATHANIEL FOX
                                          UNITED STATES MAGISTRATE JUDGE