**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ELMO SHROPSHIRE, INDIVIDUALLY AND AS A MEMBER OF "ELMO & PATSY"; On Behalf Of Himself And All Others Similarly Situated<br><br>                                  Plaintiff,<br>      -against-<br><br>SONY MUSIC ENTERTAINMENT, a Delaware General Partnership,<br><br>                              Defendant. | 06 Civ. 3252 (GBD) (KNF)<br><br>**ECF CASE** |
| "THE YOUNGBLOODS" (Perry Miller p/k/a Jesse Colin Young; Lowell Levinger; Jerry Corbitt; Mina Bauer, the widow of Joe Bauer; and manager Stuart Kutchins), On Behalf Of Itself And All Others Similarly Situated,<br><br>                              Plaintiff,<br>      vs.<br><br>BMG MUSIC,<br><br>                              Defendant. | 07 Civ. 2394 (GBD) (KNF)<br><br>**ECF CASE** |

## DECLARATION OF BRIAN D. CAPLAN IN SUPPORT OF MOTIONS FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENTS, PLANS OF ALLOCATION, AWARDS OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES, AND AWARDS TO PLAINTIFFS

      **BRIAN D. CAPLAN** makes the following declaration, under penalty of perjury, pursuant to 28 U.S.C. § 1746:

      1.      I am member of Caplan & Ross LLP, co-counsel of record together with the law firms of Milberg LLP for all Plaintiffs, Probstein, Weiner, and Butler for Plaintiff Elmo Shropshire in *Shropshire v. Sony Music Entertainment*, 06 Civ. 3252 (GBD) (KNF) (the "SME

Action") and Law Offices of Thomas A. Cohen for Plaintiff The Youngbloods in *Youngbloods v. BMG Music*, 07 Civ. 2394 (GBD) (KNF) (the "BMG Action").

2.      The parties have entered into agreements to settle the Actions ("Settlements"). The Settlements (1) make $7.95 million available to all Class Members based on their downloads sold on Apple's iTunes Store before December 31, 2010 ("Past Settlement Relief") and (2) provide for a prospective 3% increase in the royalty rate for certain Class Members (as described below) for permanent digital downloads and ringtones sold in the U.S. after January 1, 2011 ("Prospective Settlement Relief").

3.      For purposes of the proposed Settlements, Class Members are recording artists and producers who: (a) are a party to a "Class Contract" and (b) did not provide Sony Music Entertainment ("SME") or BMG Music ("BMG," now known as Arista Music ("Arista")) with a release of claims relating to payment of royalties on downloads or ringtones covering the entire period from January 1, 2004 through December 31, 2010. For the settlement in the SME Action, the class labels include but are not limited to Columbia Records, Epic Records, and Jive Records. For the settlement in the BMG Action, the class labels include but are not limited to Arista Records and RCA Records. Provident Label Group LLC and Sony Music Entertainment US Latin LLC are excluded from the settlements.

4.      "Class Contract" means a contract dated between January 1, 1976 and December 31, 2001 (the "Class Period"), that (i) was entered into with CBS Records or SME or with BMG Music (now known as Arista), including their unincorporated divisions and business units, their United States subsidiaries, and any predecessor in interest to any of them, other than Provident Label Group, LLC (including its subsidiaries) and Sony Music Entertainment US Latin LLC; (ii) is currently held by SME or Arista, including their unincorporated divisions and

business units and United States subsidiaries; (iii) contains a clause providing that SME or Arista will pay to such Class Member 50% of SME's or Arista's net receipts in respect of any Master Recording leased or licensed by SME or Arista to a third party (a "Net Receipts Provision"); (iv) does not contain a clause capping the amount to be paid under the Net Receipts Provision, such as a clause limiting payments under the Net Receipts Provision to the amount that would be paid under another royalty provision contained in the contract; (v) does not contain an express rate for digital exploitations other than a so-called "Audiophile" or "New Technology" provision; and (vi) was not modified to include an express rate for digital exploitations or to make any change to the Net Receipts Provision.

5.    I make this Declaration in support of Lead Plaintiffs' Motion for Final Approval of Class Action Settlements, Plans of Allocation, Awards of Attorneys' Fees and Reimbursement of Expenses, and Reimbursement Awards to Plaintiffs. I participated actively throughout every phase of the Actions and would be competent to testify that the following facts are true to the best of my knowledge, information, and belief.

6.    The purpose of this Declaration is to set forth the facts that support the contentions of the Plaintiffs that: (a) the proposed Settlements are fair, reasonable and adequate and should be approved by the Court; (b) the request of Class Counsel for attorneys' fees and expenses in the amounts of $1,625,625 in the SME Action and $924,375 in the BMG Action is fair and reasonable and should be approved by the Court; and (c) awards of $15,000 each to Plaintiffs Elmo Shropshire and The Youngbloods for their services as class representative are fair and reasonable and should be approved by the Court. Balancing the return that the Settlements represent with the substantial risks the Classes faced during the litigation -- which would have grown exponentially were these cases to proceed to trial -- Class Counsel achieved a

very good result for the Classes. The Settlements thus ensure a substantial recovery for Class Members, take advantage of the opportunity to reach a pretrial resolution of the Actions, and eliminate the risks of continuing litigation through class certification, summary judgment, trial and the appeals that would almost inevitably follow.

7.     After investing over 3,500 hours in the SME Action over more than six years and over 2,800 hours in the BMG Action over more than five years, on an entirely contingent-fee basis, and having obtained proposed Settlements (1) making $7.95 million available to all Class Members in connection with sales in the U.S. of permanent digital downloads and ringtones through December 31, 2010 and (2) providing for an increase in the royalty rate for certain Class Members for such sales after January 1, 2011, Class Counsel respectfully request an award of attorneys' fees and expenses in the amounts of $1,625,625 in the SME Action and $924,375 in the BMG Action. The requested fee award is less than Class Counsels' accumulated lodestar in these cases. As fully set forth in the briefing in support of the requests for attorneys' fees and expenses, Class Counsel's requests for attorneys' fees and expenses are fair, reasonable, and in line with or lower than those awarded in similar cases.

8.     The facts recited concerning the history of these Actions, Plaintiffs' claims, and the efforts of Class Counsel in obtaining the Settlements are not, and are not intended to be, all inclusive, but are set forth to provide the Court with a brief but meaningful description of the history, scope, risks, and complexity of these Actions. We respectfully submit that they demonstrate that: (i) the proposed Settlements should be approved; and (ii) Class Counsel's motions for attorneys' fees and expenses and service awards to the Plaintiffs Elmo Shropshire and The Youngbloods are fair and reasonable.

# I.    PLAINTIFFS' ALLEGATIONS

9.      SME, BMG, and their divisions and predecessors in interest ("Defendants"),
entered into recording contracts with thousands of recording artists between 1962 and 2002. The
Actions allege that most of those contracts contain a Net Receipts Provision, which requires
Defendants to pay their recording artists 50% of their net receipts from the leasing/licensing of
the Master Recordings obtained by them pursuant to the recording contracts, as opposed to the
lesser royalty amounts accounted for when they themselves manufacture and sell Records of
those Master Recordings, hereinafter referred to as the "Sales Provisions" of the recording
contracts.

10.     The pertinent terms of these provisions, found in Paragraphs 5.01 and 5.03,
respectively, of the Shropshire recording contract are as follows (emphasis and headings added):

> ### The Sales Provision (Paragraph 5.01)
>
> CBS will pay you a royalty computed at the applicable percentage,
> indicated below, of the applicable Royalty Base price *in respect of
> Net Sales of Phonograph Records* (other than audiovisual
> Records) derived from the Album *and sold by CBS or its
> Licensees Through Normal Retail Channels*.
>
> ### The Net Receipts Provision (Paragraph 5.03)
>
> In respect of any Master Recording leased by CBS to others for
> their distribution of Phonograph Records in the United States, **CBS
> will pay you fifty percent (50%) of CBS' net receipts from its
> Licensee.** ('Net receipts,' in the preceding sentence, means
> receipts as computed after deduction of all copyright, AFM and
> other applicable third party payments.).

11.     Similarly, The Youngbloods' recording contract states:

> [I]f RCA licenses the use of any Master Recordings hereunder on a
> flat fee or cent rate basis, RCA shall accrue an additional royalty
> hereunder of fifty (50%) percent of the net amount of such income
> so received by RCA.

12.     In 2003, following the advent of the Internet and the development of the ability to transmit digital copies of sound recordings, Defendants entered into agreements with Apple Computer, Inc. ("Apple") permitting Apple to distribute phonograph records of Defendants' sound recordings over the internet in the form of digital downloads on Apple's iTunes service. Defendants thereafter entered into numerous similar agreements with other Digital Download Providers[1], as well as providers of ringtones (short snippets of recordings distributed to consumers, mainly by cellular phone companies), for use as ringers on individuals' cell phones.

13.     The complaints allege that Defendants have significantly underpaid recording artists for digital download (*e.g.* iTunes) and ringtone royalties generated through third-party Digital Download Providers. The Complaints allege that royalties for such digital downloads and ringtones should be paid under the Net Receipts Provisions of the contracts, which requires the Defendants to pay artists 50% of net receipts from third party licensing/leasing revenue.

14.     Plaintiffs allege that instead of paying their recording artists 50% of the net leasing/licensing receipts they receive for a digital download, Defendants wrongfully treat each download as its own sale of a phonorecord through normal retail channels, and thereby have been accounting for such distribution of digital downloads under the Sales Provisions of the recording contracts.

## II.     HISTORY OF THE LITIGATION

### A.     SME Action Procedural History

15.     Prior to filing the initial complaint, Gerald Weiner and I were engaged to investigate potential claims against SME for breach of certain provisions found in the recording

---

[1] Digital Download Providers refers to third-party entities such as Apple and Amazon who entered into agreements with Defendants to distribute Records of Defendants' sound recordings over the internet in the form of digital downloads.

contracts. Mr. Weiner and I reviewed numerous recording contracts and conducted lengthy consultations to determine the strength of the claims. We also conducted extensive research into the distribution of recordings through Digital Download Providers. On April 27, 2006, plaintiffs Gregg Allman, Jaimoe f/k/a Johnny Lee Johnson and Butch Trucks, individually, as members of "The Allman Brothers Band," and as partners in "The Allman Brothers Band Recording Company; and, Rick Nielsen, Brad Carlson p/k/a "Bun E. Carlos", Robin Zander, and Tom Petersson, individually, and as members of "Cheap Trick"; filed the initial putative class action complaint against Sony BMG Music Entertainment in the U.S. District Court for the Southern District of New York (the "Court") asserting causes of action for breach of contract and declaratory judgment. SME Action D.E. 1. Specifically, plaintiffs alleged that SME had failed to properly account and pay royalties on income received by SME from its third-party licensees for digital downloads (such as iTunes) and ringtones and that SME had knowingly and materially breached its contractual obligations to plaintiffs and the other members of the class.

16.     On July 10, 2006, plaintiffs filed a First Amended Complaint to correct the name of the defendant, to add as an additional plaintiff Elmo Shropshire, individually, and as a member of "Elmo & Patsy", and alleging the same causes of action. SME Action D.E. 4. On September 11, 2006, SME, represented by Covington & Burling LLP, moved to dismiss the First Amended Complaint pursuant to FRCP 12(b)(6). SME Action D.E. 10. Specifically, SME argued that the First Amended Complaint failed to adequately allege breach under the specific terms of plaintiffs' contracts, in particular because the plaintiffs' contracts referred to the "leasing" of master recordings, and not the "licensing" of master recordings as alleged in the First Amended Complaint. In addition, SME sought to dismiss the declaratory judgment claim because the contractual terms in the recording contracts allegedly precluded such relief.

17. On October 13, 2006, plaintiffs filed their opposition to SME's motion to dismiss. SME Action D.E. 15. Plaintiffs' opposition was predicated on the argument that the terms "lease" and "license" were interchangeable and synonymous. On November 16, 2006, the parties appeared before this Court for oral argument on SME's motion to dismiss.

18. By order dated April 2, 2007, this Court stayed discovery in the SME Action pending a ruling on the motion to dismiss, which remained pending at that time. SME Action D.E. 21.

19. In April 2008, while the motion to dismiss remained pending, plaintiffs' counsel had become aware that SME, as part of general audits conducted by recording artists, may have been obtaining releases from putative class members possibly without providing notice to them of the pendency of this class action. Thus, on April 11, 2008, plaintiffs moved by order to show case for a temporary restraining order restricting and proscribing SME from contact with putative class members and requesting that SME provide notice of the pendency of the class action to artists in connection with the resolution of audits or other settlements with the artists. On April 28, 2008, the Court denied plaintiffs' motion for a temporary restraining order. SME Action D.E. 28.

20. On June 17, 2008, the Court granted SME's motion to dismiss. SME Action D.E. 29. The Court held that the "Plaintiffs have not plead any allegations that the Master Recordings were leased. There is, therefore, no basis from which it can reasonably be inferred that payment pursuant to the master recording lease provision is applicable." SME Action D.E. 29 at 3.

21. On June 24, 2008, the Clerk of the Court entered judgment against plaintiffs. SME Action D.E. 30. On June 30, 2008, plaintiffs filed a motion for reconsideration of the Court's Order granting SME's Motion to Dismiss, Relief from the Judgment and Leave to

Amend. SME Action D.E. 31. As part of plaintiffs' motion, plaintiffs argued that the Court had overlooked arguments that had been made regarding the use of the terms "lease" and "license" in the recording contracts at issue, that the Court interpreted the language contained in the First Amended Complaint overly narrowly, and that the Court should have granted plaintiffs leave to replead to correct certain pleading deficiencies.

22.     On August 22, 2008, the Court signed a Stipulation and Order of Voluntary Dismissal with Prejudice of Plaintiffs Rick Nielsen, Brad Carlson p/k/a "Bun E. Carlos", Robin Zander, and Tom Petersson, individually, and as members of "Cheap Trick." SME Action D.E. 36.

23.     On March 19, 2009 the Court entered an order vacating the judgment of dismissal and granting plaintiffs leave to file a Second Amended Complaint. SME Action D.E. 37.

24.     On March 23, 2009, plaintiffs filed the Second Amended Complaint which asserted causes of action for breach of contract, declaratory judgment, and otherwise clarified the pleadings. SME Action D.E. 38. Subsequent to filing the Second Amended Complaint, SME's Counsel contacted class counsel to inform them that SME intended to move to dismiss the declaratory relief claim. After taking into consideration the delay and expense involved in briefing such a motion and the merits of such motion, the parties agreed that plaintiffs would dismiss the declaratory judgment claim and SME would file an answer by a date certain. On April 14, 2009, the Court signed a Stipulation and Order of Partial Dismissal with Prejudice dismissing the causes of action for declaratory judgment. SME Action D.E. 40. On April 20, 2009, SME filed its answer to the Second Amended Complaint. SME Action D.E. 41.

25.     On April 22, 2009, Magistrate Kevin N. Fox issued an Order requiring the parties to appear on May 19, 2009 for an Initial Pre-Trial Conference. SME Action D.E. 42. Prior to the

pre-trial conference, the parties conferred but were unable to agree on a discovery schedule. The parties had a significant disagreement as to whether discovery should be bifurcated, with merits discovery preceding class certification discovery, as SME suggested or whether discovery should proceed on all issues simultaneously. The parties submitted a joint-letter dated May 15, 2009 containing their respective positions.

26.    On May 19, 2009, Magistrate Fox issued a pretrial order which *inter alia* bifurcated discovery such that merits discovery be completed before class certification discovery would commence. SME Action D.E. 44.

27.    On April 16, 2010, plaintiffs filed the Third Amended Complaint adding the Allman Brothers Band Recording Company as a plaintiff. SME Action D.E. 55. On May 7, 2010, SME filed its answer to the Third Amended Complaint. SME Action D.E. 58. On September 15, 2010, the Court signed a Stipulation and Order of Voluntary Dismissal with Prejudice of Plaintiffs Allman Brothers Band Recording Company; Gregg Allman, Jaimoe f/k/a Johnny Lee Johnson and Butch Trucks, individually, as members of "The Allman Brothers Band," and as partners in "The Allman Brothers Band Recording Company". SME Action D.E. 70.

28.    On September 20, 2010, Plaintiff Elmo Shropshire filed a motion for partial summary judgment. SME Action D.E. 72. Plaintiff argued that the contracts are unambiguous and require SME to pay 50% of the proceeds from Master Recordings which are leased. Plaintiff relied heavily on a substantially similar case decided on September 3, 2010 in the Ninth Circuit, *F.B.T. Prods., LLC v. Aftermath Records*, 621 F.3d 958 (9th Cir. 2010), in which the court held that the unambiguous terms of both the recording contract governing exploitation of the artist's

recordings, and the agreements with the Digital Download Providers (including the agreement governing Apple's iTunes Service) mandated summary judgment in favor of the recording artist.

29.     On January 14, 2011, SME filed a motion for summary judgment. SME Action D.E. 80. In that motion, SME raised numerous arguments in support of its motion. Specifically, SME argued that (1) the "Audiophile provision" in the recording contracts establishes the royalty rate for digital downloads; (2) the NRC (sales) provision found in the contract governs sales of digital downloads; (3) the terms "lease" and "license" are not synonymous; (4) the lease provision only applies to ancillary exploitations; (5) even if the contract is ambiguous all of the extrinsic evidence supports SME's position that the lease provision does not apply to the sales of digital downloads; and (6) even if the Court found that the licensing provision applied to certain Digital Download Providers, it would not apply to Liquid Media, Apple, and Amazon. Along with its motion, SME filed a 215-paragraph Rule 56.1 Statement.

30.     Upon the filing of SME's motion for summary judgment, plaintiff's counsel began preparing a response to both SME's motion and to its Rule 56.1 Statement. Plaintiff's counsel spent a significant amount of time drafting responses to each and every one of the paragraphs contained in SME's Rule 56.1 Statement. Plaintiff was within one day of filing his opposition brief when the parties reached an agreement in principle to settle.

## B.     BMG Action Procedural History

31.     On March 23, 2007, plaintiff The Youngbloods (Perry Miller p/k/a Jesse Colin Young; Lowell Levinger; Jerry Corbitt; Mina Bauer, the widow of Joe Bauer; and manager Stuart Kutchins) filed the initial putative class action complaint against Sony BMG Music Entertainment in this Court asserting causes of action for breach of contract, declaratory judgment and breach of covenant of good faith and fair dealing. BMG Action D.E. 1.

32.     On April 19, 2007, The Youngbloods filed a First Amended Complaint alleging the same causes of action against BMG. BMG Action D.E. 5. On June 25, 2007, BMG moved to dismiss the Amended Complaint pursuant to FRCP 12(b)(6). BMG Action D.E. 13. On March 31, 2008, the Court ordered that the fifth cause of action for breach of covenant of good faith and fair dealing be dismissed, otherwise denied BMG's motion and granted The Youngbloods leave to file an amended complaint. BMG Action D.E. 21.

33.     On May 9, 2008, The Youngbloods filed the Second Amended Complaint which asserted causes of action for breach of contract, declaratory judgment and otherwise clarified the pleadings. BMG Action D.E. 27. On May 30, 2008, BMG moved to dismiss the Second Amended Complaint pursuant to FRCP 12(b)(6). BMG Action D.E. 28. On March 24, 2009, the Court denied BMG's motion to dismiss the Second Amended Complaint. BMG Action D.E. 33. On April 20, 2009, BMG filed its answer to the Second Amended Complaint. BMG Action D.E. 36.

34.     On May 4, 2009, Magistrate Fox issued an order requiring the parties to appear on May 19, 2009 for an Initial Pre-Trial Conference. BMG Action D.E. 39. Prior to the pre-trial conference, the parties conferred but were unable to agree on a discovery schedule. The parties had a significant disagreement as to whether discovery should be bifurcated as BMG suggested or whether discovery should proceed on all issues simultaneously. The parties submitted a joint-letter containing their respective positions.

35.     On May 19, 2009, Magistrate Fox issued a pretrial order which *inter alia* bifurcated discovery such that merits discovery be completed before class certification discovery would commence. BMG Action D.E. 40.

36.     On August 23, 2010, Arista Music, formerly BMG Music, filed a complaint and on October 21, 2010 Arista Music filed an amended complaint against individual members of the Youngbloods and their former manager. *Arista Music v. Levinger et al.* (N.D.Ca. Case # C 10-03744 WHA). The amended complaint sought a declaratory judgment of rescission of a 1995 settlement agreement between the Youngbloods and RCA (predecessor in interest to BMG), indemnity and related damages. The suit was dismissed without prejudice on or about November 22, 2011.

37.     On August 31, 2010, BMG filed a motion to stay the proceedings and for leave to amend its answer. BMG Action D.E. 61. In its motion, BMG suggested that the action it filed in the Northern District of California may be dispositive on certain issues relating to this litigation and therefore a stay should be imposed and that it should be granted leave to amend to add an additional affirmative defense of rescission. On September 17, 2010, The Youngbloods filed an opposition brief to the motion to stay and for leave to amend. The Youngbloods argued that BMG had not met its burden of proving that the action should be stayed and that staying the action and allowing BMG to amend would be prejudicial to Plaintiff and the putative class. BMG Action D.E. 65. On November 9, 2010, Magistrate Fox denied BMG's motion to stay the proceedings and granted leave for BMG to file an amended answer. BMG Action D.E. 73. On November 19, 2010, BMG filed its amended answer to the Second Amended Complaint. BMG Action D.E. 74.

38.     On November 23, 2010, BMG filed a motion for reconsideration of the November 9, 2010 Order. BMG Action D.E. 76. BMG argued that the Court made numerous errors in its November 9, 2010 order including, that the Court overlooked certain factors which supported staying the case for (1) the purpose of preserving judicial economy; (2) the facts supporting the

balance of harm analysis; and (3) the overriding case law which supported the stay. BMG Action D.E. 77. On November 24, 2010, BMG filed a similar Objection to the November 9, 2010 Order. BMG Action D.E. 78. On December 8, 2010, The Youngbloods filed its opposition to BMG's Motion for Reconsideration. BMG Action D.E. 81. The Youngbloods argued that the Court had correctly analyzed all the issues in BMG's stay motion and had reached the appropriate result based on the case law. On December 13, 2010, The Youngbloods filed a similar opposition to BMG's Objection to the November 9, 2010 Order. BMG Action D.E. 82.

39.     On January 6, 2011, the Court granted in part and denied in part BMG's motion for reconsideration. BMG Action D.E. 99. The Court granted the motion for the limited purpose of "correcting any errors, not affecting the merits of the outcome and to clarify any misunderstanding with respect to the two related actions." The Court denied BMG's motion in all other respects. On the same day, the Court filed an Amended Memorandum and Order denying Defendant's Motion to Stay and granting Defendant's Motion to Amend. BMG Action D.E. 100. Defendant then filed an Objection to the Court's January 6, 2011 Order. BMG Action D.E. 103. BMG argued that the Court incorrectly ruled on BMG's motion to stay. On February 7, 2011, The Youngbloods filed a memorandum of law in opposition to BMG's Objection. BMG Action D.E. 106. The Objection was still pending when the parties reached an agreement in principle.

40.     On September 23, 2010, The Youngbloods filed a motion for partial summary judgment. BMG Action D.E. 67. The Youngbloods argued that the contracts are unambiguous and require BMG to pay 50% of the proceeds from Master Recordings which are licensed. As in the SME action, The Youngbloods relied heavily on a substantially similar case decided on September 3, 2010 in the Ninth Circuit, *F.B.T. Prods., LLC v. Aftermath Records*, 621 F.3d 958

(9th Cir. 2010), in which the court held that the unambiguous terms of both the recording contract governing exploitation of the artist's recordings and the agreements with the Digital Download Providers (including the agreement governing Apple's iTunes Service) mandated summary judgment in favor of the recording artist.

### C. Comprehensive Merits Discovery in Both Actions

41.     Class Counsel engaged in extensive discovery in both cases including, *inter alia*, serving requests for production of documents on SME and BMG, serving interrogatories on BMG, as well as conducting numerous depositions. Class Counsel carefully considered the discovery responses when preparing Plaintiffs' Motions for Partial Summary Judgment, Shropshire's Opposition to SME's Motion for Summary Judgment and in ultimately determining whether the Settlement was the most effective method for resolving this law suit.

42.     Class Counsel noticed and took six depositions and defended and/or participated in an additional nine depositions in both Actions. Those depositions took place throughout the United States including in California, New York, Texas, and Georgia. During the course of those depositions, Class Counsel had disputes with Defense counsel and conference calls were held with the Court to resolve those issues.

43.     Discovery in these cases was extremely contentious with numerous disputes. Defendants opposed or objected to nearly every discovery request. Productions were often delayed. Disputes over the parties' refusals and failures to respond adequately were frequently the subject of letters to the Court resulting in multiple written Court decisions and hundreds of pages of briefs and correspondence among the parties.

44.     Defendants submitted to the Court numerous letters which suggested certain discovery abuses by Plaintiffs. Plaintiffs vehemently opposed those letters. Plaintiffs also

submitted numerous letters to the Court to address various attempts by Defendants to deny or delay discovery in these actions. Many of these letters resulted in teleconferences with the Court.

45.     After extensive letter writing relating to various discovery issues in both actions, on November 29, 2010, the Court made numerous findings regarding various discovery issues. At that point, the Court sanctioned The Youngbloods and required them to pay reasonable attorney's fees related to certain additional depositions. BMG Action D.E. 80. The Youngbloods filed a motion for partial reconsideration of the November 29, 2010 Order. BMG Action D.E. 83. Specifically, The Youngbloods asked that the Court reconsider its holding requiring them to pay the costs and reasonable attorneys' fees associated with any reopened deposition, and requiring The Youngbloods to produce documents in response to Requests 2, 3, 4, 7 and 8. The Youngbloods argued that under the Rule 37, the Court could not impose sanctions on The Youngbloods and that sanctions were not warranted under the circumstances. BMG Action D.E. 84. The Youngbloods filed a similar Objection to the November 29, 2010 Order. BMG opposed The Youngbloods' motion for reconsideration arguing that The Youngbloods were inappropriately raising new arguments and even if the Court considered those arguments they were unavailing. BMG Action D.E. 92. On January 11, 2011, the Court granted The Youngbloods' motion for partial reconsideration, reversing the award of attorney's fees and correcting the numbering of the document requests. BMG Action D.E. 102.

46.     Notwithstanding the many disputes among the parties, Plaintiffs, since 2009, obtained and reviewed approximately 8,500 pages of documents from Defendants, including dozens of agreements between Defendants and Digital Download and Ringtone Providers. Class Counsel spent hundreds of hours reviewing the documents. Specifically, Class Counsel spent tens of hours analyzing the various Digital Download and Ringtone Provider Agreements in

order to demonstrate that Defendants leased/licensed and did not sell Master Recordings to these providers. Plaintiffs used many of these documents at the depositions as well as in support of their motions for partial summary judgment.

47.     Plaintiffs and their counsel also produced hundreds of documents some of which dated back to the 1960s and 1970s. The individual members of The Youngbloods spent tens of hours locating documents and communications sent internally and to Defendants. For The Youngbloods, Lowell Levinger, Jesse Colin Young, and (former member) Jerry Corbitt were deposed and manager Stuart Kutchins was deposed twice. Plaintiff Elmo Shropshire also spent numerous hours searching for documents and communications and was deposed for almost five hours. His assistant, Nancy Clary, also testified at a deposition and searched for documents.

### D.     Settlement Negotiations

48.     After engaging in discovery and vigorous, arms'-length negotiations with the assistance of mediator Eric Van Loon of JAMS, the parties reached an agreement regarding the settlement of the Actions, set forth initially in a Confidential Summary Term Sheet ("Term Sheet"), entered into and dated August 11, 2011, and then memorialized in the Stipulations dated March 7, 2012 [SME Action D.E. 94; BMG Action D.E. 121], which were amended on May 24, 2012. SME Action D.E. 97; BMG Action D.E. 124.

49.     During the pendency of these Actions, Class Counsel engaged in extensive negotiations with Defendants prior to entering into the Settlement. Those negotiations included mediation briefs submitted by the parties to Eric Van Loon of JAMS. The parties first agreed to mediation in or around March 2010. The parties selected Mr. Van Loon from a list of potential mediators proposed by both sides in an attempt to find a mutually-satisfactory mediator. Mr. Van Loon has extensive mediation experience and was familiar with the entertainment industry and intellectual property issues. After the filing of those briefs, on May 6, 2010 and May 21, 2010,

the parties attended mediation sessions in New York conducted by Mr. Van Loon of JAMS and subsequently participated in teleconferences with Mr. Van Loon on numerous additional occasions throughout June 2010. In July 2010, the parties continued to negotiate through Mr. Van Loon via email and teleconferences. On July 13, 2010, the parties attended a half-day settlement conference conducted by Magistrate Fox. Mr. Van Loon was continually apprised of the status of the case throughout August and September 2010, with various teleconferences and emails with the parties. Throughout February 2011, the parties communicated with the mediator in anticipation of future mediation sessions. On March 3-4, 2011, the parties attended marathon mediation session in New York conducted by Mr. Van Loon. The session lasted over 20 hours and resulted in significant progress in the settlement discussions. Following the session, on a daily basis the mediator followed up on the discussions in order to bring them to a conclusion. On March 11, 2011, the parties submitted a letter to Magistrate Fox advising the Court that the parties had reached a settlement in principle and requesting an order adjourning all deadlines which was granted. The parties thereafter participated in a significant number of mediation sessions by teleconference with Mr. Van Loon on numerous occasions between March and August 2011 in an attempt to iron out many of the remaining issues related to the term sheet. On August 10 and 11, 2011, the parties again attended a mediation session in New York conducted by Eric Van Loon at which the parties finally agreed to and executed a settlement term sheet.

50.      As seen in the preceding paragraph, the Settlements are the result of many months of extensive, intense settlement negotiations between Plaintiffs and Defendants. The negotiations were conducted over a period of almost two years, and included, *inter alia*, several full-days of in-person mediation before Mr. Van Loon and numerous teleconferences overseen by him and

numerous conference calls between counsel for the parties directly. Both parties spent in excess of $62,000 each on mediation costs.

51.     These Settlements were also achieved with the considerable assistance of the named Plaintiffs in these Actions. There is absolutely no indication here of fraud or collusion. Discussions concerning the terms of the Settlement were conducted by senior lawyers for Plaintiffs and Defendants, experienced in prosecuting and negotiating complex class actions such as this. For all of these reasons, counsel for Plaintiffs submit that the proposed Settlements are fair, reasonable and adequate, and the interests of the Classes are better served by the Settlements than by further litigation.

52.     Many considerations went into Plaintiffs' determination that these Settlements are fair, reasonable, and adequate. First, there were significant litigation risks including (1) whether there were ambiguities in the Defendants' recording contracts which could make summary judgment on the merits and certifying a class difficult; (2) whether the Supreme Court would vacate the decision of the Ninth Circuit in *F.B.T. Prods., LLC v. Aftermath Records*, 621 F.3d 958 (9th Cir. 2010), which was heavily relied upon by Plaintiffs' in their motions for partial summary judgment to demonstrate that the agreements with Digital Download Providers constitute licenses of Master Recordings; (3) whether differences in the agreements between Defendants and Digital Download Providers would have a significant impact on potential damages available to recording artists; (4) whether the term "lease" contained in SME's recording contracts means the same thing as the term "license"; (5) whether the so-called "Audiophile" deduction applied to the distribution of downloads at issue here; and (6) the impact of the Arista litigation in California (*Arista Music v. Levinger et al.* (N.D.Ca Case # C 10-03744 WHA)) on the BMG Action.

53.     Further, Plaintiffs and Class Counsel recognized that, even if Plaintiffs were successful on the merits and were able to get a class certified, prospective relief may not have been available under the contracts. If so, while class members would have been in a position to recover only past damages, there would be nothing besides the threat of future legal action to prevent Defendants from continuing to account for digital royalties on the same basis. Moreover, Defendants suggested that they could redraft their contracts with Apple (and others) on a going-forward basis in order to make the conveyance of master recordings to iTunes into sales, not licenses. In short, the 3% future royalty increase may be a significant part of the recovery, and recovery for future damages might not have been possible even if there were further legal action.

54.     Even after a framework for a settlement was agreed upon by the parties, the parties entered into significant negotiations over the necessity for and details of a claims process. Numerous conference calls, with and without the mediator, were necessary in order to resolve the issues relating to the proof of claim process. In addition, there were significant negotiations over the terms of the release and other language contained in the various settlement documents.

55.     Elmo Shropshire and the members of The Youngbloods (especially Stuart Kutchins), played important roles in the settlement negotiations. Throughout the many hours of mediation, Plaintiffs were consulted on various aspects of the settlement documents and used their knowledge of the industry to help determine that the terms of the settlements were fair, reasonable, and adequate under the circumstances.

56.     After negotiating the substantive terms of the Settlements, Class Counsel retained an experienced royalty auditor, Gary Cohen, to conduct confirmatory discovery with respect to the methodologies used by Defendants in connection with the settlement negotiations and the accuracy of the figures upon which the Settlements are based. Class Counsel are experienced in

complex litigation such as this and now, following the completion of confirmatory discovery, believe that the proposed Past Settlement Relief and Prospective Settlement Relief are fair, reasonable, and adequate, and the proposed method of allocating the Past Settlement Relief and Prospective Settlement Relief are fair and reasonable. Accordingly, Class Counsel believes that the Settlements are fair, reasonable, and adequate, and the interests of the Classes are better served by the Settlements than by further litigation.

57.     The Actions have thus far proven highly complex, lengthy, and expensive, and this would likely not have lessened in the absence of the proposed Settlements. This litigation involves complex issues relating to royalty accounting, contract interpretation, and class certification. Indeed, Class Counsel collectively have already expended thousands of hours of attorney (and other professional) time and tens of thousands of dollars in reasonable out-of-pocket expenditures.

58.     Plaintiffs and Class Counsel believe that the breach of contract and declaratory judgment claims asserted in the Actions are meritorious and that the evidence developed to date supports the claims asserted, but they have considered and weighed the issues involved in establishing the validity of their claims, as well as issues relating to the certification of a class, and have concluded that, in light of the uncertainty of the outcome as well as Defendants' vigorous denial of liability, the substantial risks and inevitable delay in proceeding to trial, and compared to the benefits being provided by the proposed Settlements, the terms and conditions of the proposed Settlements are fair, reasonable, and adequate and should be approved by the Court.

### III. TERMS OF SETTLEMENTS AND THE ALLOCATION OF THE SETTLEMENTS

59.     Settlement negotiations were extremely contentious. For example, during the initial negotiations, Defendants were unwilling to include any prospective relief. Plaintiffs and their counsel were adamant that they were unwilling to settle the Actions without prospective relief. Throughout the negotiating sessions, Defendants' Counsel repeatedly emphasized that Plaintiffs would not be able to certify a class and that in any event Defendants would prevail on the merits. Nevertheless, Class Counsel rejected offers from Defendants whose terms were substantially less favorable than those ultimately agreed upon.

60.     The proposed Settlements (1) make $7.95 million available to all Class Members based on their downloads sold on Apple's iTunes Store before December 31, 2010 ("Past Settlement Relief") and (2) provide for a prospective additional payment of 3% of the wholesale price to be paid to certain Class Members (as described below) for permanent digital downloads and ringtones sold in the U.S. after January 1, 2011 ("Prospective Settlement Relief").

61.     More specifically, the Past Settlement Relief includes:

$7.65 million, less Plaintiffs' attorneys' fees and expenses as may be approved by the Court, for Class Members (1) who had at least 28,500 total downloads of recordings attributable to Class Contracts and sold in the United States by SME or BMG (n/k/a Arista) on Apple's iTunes Store from inception through December 31, 2010 and (2) who submit a valid Claim Form. These funds would be paid or credited, as applicable, *pro rata* to the royalty accounts of qualifying Class Members.

$300,000 cash, without any deduction of fees or expenses, which will be paid to all Class Members, regardless of their royalty account balance, for those Class Members (1) who had fewer than 28,500 total downloads of recordings attributable to Class Contracts and sold in the United States by SME or BMG (n/k/a Arista) on Apple's iTunes Store from inception through December 31, 2010 and (2) who submit a valid Claim Form. The cash would be paid equally *per capita* among qualifying Class Members.

62. The proposed settlements allocate the $7.65 million and $300,000 Past Settlement

Relief amounts between the *SME Action* and the *BMG Action* based on the relative proportion of

sales by SME to sales by BMG (n/k/a Arista) in the U.S. on Apple's iTunes Store through

December 31, 2010.

63. Based on the respective sales data, 63.75% is attributed to the settlement with

SME ($4,876,875 of the $7.65 million fund and $191,250 of the $300,000 fund) and 36.25% is

attributed to the settlement with BMG (n/k/a Arista) ($2,773,125 of the $7.65 million fund and

$108,750 of the $300,000 fund).

64. With respect to the Prospective Settlement Relief:

> SME and Arista have agreed to modify the Class Contracts of Class Members who submit a valid Claim Form and who qualify for Prospective Settlement Relief to provide that SME and Arista will calculate royalties on Sales[2] in the United States of permanent digital downloads and ringtones of recordings attributable to Class Contracts under the royalty provisions that it currently applies to such Sales, and shall add an additional royalty equal to 3% of the gross amount paid or credited to SME or Arista with respect to each such U.S. permanent digital download or ringtone, with no deductions of any kind and no reserves held (the "Additional Royalty").

65. The Additional Royalty is available to Class Members with:

> (i) at least 28,500 total downloads of recordings attributable to Class Contracts and sold in the United States by SME or BMG (n/k/a Arista) on Apple's iTunes Store from inception through December 31, 2010 (such Additional Royalty to be applied to all Sales after January 1, 2011); or

> (ii) with fewer than 28,500 total downloads of recordings attributable to Class Contracts and sold in the United States by

---

[2] For purposes of these settlements, "Sales" means any distribution in the United States of permanent digital downloads or ringtones, whether by sale, license, or otherwise, excluding, for the avoidance of doubt, uses of sound recordings attributable to Class Contracts in motion pictures, television, advertising, or other uses for which SME or Arista currently accounts under such Class Contracts' Net Receipts Provisions.

SME or BMG (n/k/a Arista) on Apple's iTunes Store from inception through December 31, 2010, but (x) who have at least $18,000 of royalty earnings attributable to Sales in the United States of any such recordings on Apple's iTunes Store within any two consecutive royalty accounting periods after January 1, 2011, and (y) who thereafter assert their right to such Additional Royalty within the period within which such Class Member, under the terms of the applicable Class Contract, may object to royalty accountings for the later of such two consecutive royalty accounting periods (provided that SME and Arista shall owe such Additional Royalty only commencing with the royalty period following such assertion of right).

66.     Class Members with fewer than 28,500 total downloads of recordings attributable to Class Contracts and sold in the United States by SME or BMG (n/k/a Arista) on Apple's iTunes Store from inception through December 31, 2010 who do not have at least $18,000 of royalty earnings attributable to Sales in the United States of any such recordings on Apple's iTunes Store within any two consecutive royalty accounting periods after January 1, 2011 will not be eligible for the Additional Royalty.

67.     With the active participation of the mediator, the parties negotiated and agreed to a minimum download threshold (ultimately, at least 28,500 total downloads of recordings attributable to Class Contracts and sold in the United States by SME or BMG (n/k/a Arista) on Apple's iTunes Store[3] from inception through December 31, 2010 within both the Prospective Settlement Relief and the Past Settlement Relief) based on Defendants' representation that without a minimum download threshold there would be a prohibitive administrative burden to them in administering any prospective settlement relief that they would not agree to incur.

68.     During the settlement negotiations, Class Counsel were informed by Defendants and subsequently confirmed that there are several thousand artists who are potential Class

---

[3] Given that iTunes had an overwhelming market share during the relevant period, the parties agreed to use iTunes for the minimum download threshold, with a proportionate gross-up added to account for non-iTunes sales.

Members and who have fewer than 28,500 iTunes downloads sold in the relevant period (which spanned approximately 8 years from 2002 through December 31, 2010). Class Counsel were further informed by Defendants' Counsel that: (i) there are nearly one thousand such artists whose total iTunes sales in the period are less than $100; (ii) modifying royalty rate terms within the royalty system will be a labor-intensive, manual process—and this group is more likely to include artists whose royalty terms were initially established in legacy systems in which there was less flexibility in the royalty set-up, making changes even more complicated to implement; (iii) the costs of re-coding royalty rates for many of these artists would certainly exceed the value of the benefit that they would receive; and (iv) it is this administrative cost, and the fact that in many instances it could exceed the value of any benefit to the artist, that made a threshold necessary for the Prospective Settlement Relief.

69.     To compensate Class Members who do not meet the minimum download threshold for Prospective Settlement Relief with the assistance of the mediator, the parties agreed to allocate the Past Settlement Relief available to those Class Members as cash payments without regard to a Class Member's royalty account balance (that is, they would be paid their share of the Past Settlement Relief in cash, even if their royalty account balance were negative due to unrecouped advances and expenses previously paid by Defendants) and allocated on a *per capita* basis, so as to minimize the costs to Defendants of calculating an allocation to those below the minimum download threshold. The parties also agreed with the assistance of the mediator to a mechanism whereby if their future sales hit certain levels that alleviate the administrative burden, those Class Members would then become eligible for the Prospective Settlement Relief.

## IV.     MAILING AND PUBLICATION NOTICE OF THE SETTLEMENT

70.     The Court set a schedule for mailing the Notice, Amended Notice, and the Claim Form to each royalty recipient and for publishing the summary notice in *Billboard* magazine.

Defendants' Counsel shall, at least 60 days before the Settlement Hearing, file with the Court proof of mailing of the Amended Notice and Claim Form, and proof of publication of the Amended Publication Notice.

71.     The Notice, Claim Form, Stipulations, and other related documents were also posted on a website created in connection with the settlement of the Actions (**www.DigitalDownloadClassSettlement.com**).

72.     The Notice provided Class Members with detailed information about: (1) the proposed Settlements; (2) the proposed plans of allocation; (3) participating in the proposed Settlements by submitting a Claim Form; (4) opting out of the proposed Settlements; (5) objecting to the proposed Settlements or any of their terms, including the proposed plans of allocation and Class Counsel's applications for an award of attorneys' fees and expenses and service awards for Plaintiffs; and (6) appearing at the Settlement Hearings to challenge the proposed Settlements or any of their terms, including the proposed plans of allocation and Class Counsel's applications for an award of attorneys' fees and expenses and service awards for Plaintiffs. The deadline to opt out or object to the proposed Settlements is July 5, 2012.

73.     Although the deadlines for Class Members to opt out or object to the proposed Settlements have not yet passed, as of the date of this declaration, to Class Counsel's knowledge, there have yet to be any opt-outs or objections to the proposed Settlements.

## V.     CLASS CERTIFICATION

74.     Because the Court bifurcated discovery and put merits discovery prior to class discovery, Plaintiffs had not yet filed their motions for class certification. Plaintiffs believe that, had they made the motion, the Court would have certified the classes because the classes would satisfy the requirements of Fed. R. Civ. P. 23(a).

75.     The parties estimate that the Classes consist of thousands of members and are therefore so numerous as to merit a class action.

76.     The Class Members all have numerous questions of law and fact in common because all claims arise out Defendants' uniform treatment of royalties which result from the transfer of Master Recordings to Digital Download Providers and from form contract language contained in thousands of Class Contracts.

77.     Plaintiffs' claims are typical of those of other class members.

78.     Plaintiffs will adequately represent the Classes for settlement purposes because their interests are not antagonistic to those of other Class Members and because Class Counsel is qualified and experienced. Under the law, therefore, the proposed Class for settlement purposes is adequate.

79.     As the United States Supreme Court has stated, Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods. v. Windsor,* 521 U.S. 591, 623 (1997). Here common liability issues abound, including whether Plaintiffs' interpretation of the licensing/leasing provision contained in the Class Contracts requires Defendants to pay 50% of net receipts resulting from the transfer of Master Recordings to Digital Download Providers. These and related issues are all susceptible to common proof on a class-wide basis, and far outweigh any possible individual issues that could arise in this action.

80.     Resolving these matters as a Class action is a superior method to resolving them on an individual basis. It is more efficient and effective than requiring thousands of artists to pursue their rights individually. Requiring this case to be litigated on an individual basis would risk disparate results in nearly identical suits and exponentially increase the cost of litigation.

Class action treatment, by contrast, would achieve economies of time and effort, resolving common legal and factual issues without sacrificing procedural fairness or bringing about other undesirable results.

## VI. THE SETTLEMENTS ARE FAIR, REASONABLE, AND ADEQUATE AND IN THE BEST INTERESTS OF THE CLASSES AND WARRANT THIS COURT'S APPROVAL

81. Class Counsel are actively engaged in complex federal and state civil litigation, particularly the litigation of class actions and entertainment law. Class Counsel's experience in those fields allowed us to identify the complex issues involved in these cases and to formulate strategies to effectively prosecute these cases to their conclusion. I believe that our reputation as attorneys who will zealously carry a meritorious case through the trial and appellate levels, as well as our demonstrable ability to develop and present the evidence in this litigation, gave us a firm understanding of the parties' respective positions during settlement negotiations.

82. While firmly believing that the claims asserted against Defendants have merit, Elmo Shropshire, The Youngbloods, and Class Counsel concluded that the Settlements are fair, reasonable, and in the best interests of the Classes. In coming to this conclusion, Elmo Shropshire, The Youngbloods, and Class Counsel considered, among other things: the substantial and immediate benefits that members of the Classes will receive from the Settlements; the risks associated with proving each element of their claims; and the risks associated with an appeal by Defendants if Plaintiffs won a jury verdict.

83. Elmo Shropshire, The Youngbloods, and Class Counsel also considered the defenses vigorously asserted by Defendants throughout the course of the litigation, including those set forth in SME's summary judgment motion, which were reiterated during the mediation sessions. Defendants denied that they were liable to Plaintiffs or the Classes and contended that the contracts unambiguously allowed them to treat digital downloads as sales rather than

leases/licenses. Defendants also continuously asserted that, even if Plaintiffs were correct, certain

provisions in the recording contracts would severely limit the amount of recovery. Moreover, the

parties disagreed as to whether any prospective relief would be available had the cases gone to

trial.

84.     Further, the Classes in these Actions had not yet been certified due to the

bifurcation of discovery and Defendants had indicated that they intended to vigorously oppose

class certification.

85.     In addition, the Court had yet to rule on Plaintiffs' or SME's summary judgment

motion. In light of the risks Plaintiffs faced, success was far from guaranteed.

86.     The Settlements represent a very good recovery for the members of the Classes,

and were achieved in an expeditious manner. Plaintiffs and their counsel believe that the

proposed Settlements (1) making $7.95 million available to all Class Members in connection

with sales in the U.S. of permanent digital downloads and ringtones through December 31, 2010

and (2) providing for an increase in the royalty rate for certain Class Members for such sales

after January 1, 2011 are a very good result under the circumstances. These circumstances

include the various hurdles faced by Plaintiffs in litigating these cases.

87.     Accordingly, Plaintiffs and Class Counsel believe that the Settlements are fair,

reasonable, and adequate in all respects, and should be approved by the Court.

## VII.     FACTORS TO BE CONSIDERED IN SUPPORT OF FINDING THAT THE SETTLEMENTS ARE FAIR, REASONABLE AND ADEQUATE

### A.     Continued Litigation Would Be Complex and Consume Substantial Judicial and Private Resources

88.     The complexity, expense, and possible duration of this litigation weigh in favor of

the proposed Settlements. Although Plaintiffs have conducted significant merits discovery, the

costs and duration of conducting class discovery, additional motion practice, trial preparation, a trial itself, post-trial motions, and any appeals would be substantial.

89.     Whatever the outcome of any eventual trial, which would likely require several weeks and involve the introduction of hundreds (if not thousands) of exhibits, vigorously contested motions and significant expenses, it is virtually certain that appeals would be taken from any verdict. All of the foregoing would delay the ability of the Class to recover for years - assuming, of course, that Plaintiffs would ultimately be successful in proving their claims.

90.     Settlement at this juncture unequivocally results in a substantial and tangible present recovery for the Classes, without any attendant risks of delay, or of continued litigation through, for example, summary judgment, motions for class certification, a protracted trial, and post-trial proceedings.

### B.     Reaction of the Classes to the Settlements

91.     Relatively small numbers of opt-outs or objections would suggest a favorable reaction by the Classes and weigh in favor of approval of the proposed Settlements and their terms, including the proposed plans of allocation and Class Counsel's applications for an award of attorneys' fees and expenses and service awards for Plaintiffs.

92.     The deadline to opt out or object to the proposed Settlements is July 5, 2012. Although the deadline for Class Members to opt out or object to the proposed Settlements has not yet passed, as of the date of this declaration, to Class Counsel's knowledge, there have yet to be any opt-outs or objections to the proposed Settlements. In the event that objections are filed, Class Counsel will respond to the objections in a reply brief filed with the Court no later than September 20, 2012, two weeks before the October 4, 2012 Settlement Hearing.

**C.     Settlement was Reached at an Advanced Stage of Litigation After Significant Discovery**

93.     The advanced stage of this litigation and the extensive amount of discovery completed weigh in favor of approval of the Settlements. As detailed above, the parties have been vigorously litigating these Actions for more than five years, through multiple motions to dismiss, discovery motions and the parties' briefed summary judgment motions.

94.     Plaintiffs have reviewed more than 8,500 pages of documents and taken five depositions and one expert deposition. Defendants have deposed current and former members of The Youngbloods, Plaintiff Shropshire, an employee of Plaintiff Shropshire, Gerald Weiner, and Thomas Cohen.

95.     The parties conducted multiple full-day mediation sessions before Eric Van Loon and exchanged extensive mediation statements on liability.

96.     Thus, the parties reached agreement to settle the litigation at a point when they had a well-informed understanding of the legal and factual issues surrounding their case. Having sufficient information to properly evaluate the strengths and weaknesses of their case, Class Counsel were able to settle the litigation on terms highly favorable to the Classes without the substantial risk, uncertainty, and delay of continued litigation.

**D.     The Risk of Maintaining a Class Action Through Trial Also Weighs in Favor of Approval**

97.     SME raised numerous issues in its motion for summary judgment and throughout mediation which indicated that even if it were unsuccessful in its motion for summary judgment it would argue that a class could not be maintained because the intent of the parties to each recording contract would be in question. Many of the same issues raised by SME in the SME Action would equally apply to the BMG Action. Furthermore, Defendants have suggested that

not all of the Class Contracts contain the same provisions and the differences in the various contracts would make it difficulty if not impossible to certify a class.

98.     Without a class certified it would be difficult if not impossible for many, if not most, of the class members to adjudicate the issue presented in these Actions. Many of the artists who will ultimately receive compensation from these Actions have only small claims against the Defendants and it would not be economically feasible for them to bring individual actions.

**E.      The Settlements Are Reasonable When Viewed in Light of the Best Possible Recovery and the Risks of Continued Litigation**

99.     Under the proposed Settlements, $7.95 million will be available to all Class Members in connection with sales in the U.S. of permanent digital downloads and ringtones through December 31, 2010. Although Defendants have contracts with thousands of artists, a significant number of artists either had contracts outside the class period, did not have a 50% licensing fee clause, or (especially the best selling artists) had renegotiated and or settled to establish a specific digital rate. Thus, the total amount of potential damages is considerably less than the public perception of the amount of money at stake. Based upon Defendants' representations made during the settlement process, as confirmed by confirmatory discovery, this $7.95 million represents a recovery of almost 50% of the total amount of potential damages recoverable for recordings artists with eligible Class Contracts who have not already settled their claims with Defendants through audits or contract modifications. This percentage is well within the "range of reasonableness" established by this Court and others.

100.    Moreover, Class Counsel was able to obtain an increase in the royalty rate for certain Class Members for such sales after January 1, 2011. This prospective relief may not have been available even if Plaintiffs were successful at trial. Based upon Defendants' representations made during the settlement process, as confirmed by the confirmatory discovery, the additional

royalty payment equal to 3% of the gross amount paid or credited to SME or Arista with respect to each such U.S. permanent digital download or ringtone, with no deductions of any kind and no reserves held, represents an approximate 25% increase in the effective royalty for the average artist, as Defendants represented that the weighted average royalty rate paid to artists with Class Contracts and more that 30,000 downloads during the relevant period was approximately at least 11% of the gross amount paid or credited to Defendants.

### F. The Settlements were the Result Of Arm's Length Negotiations and are Free from Fraud and Collusion

101. The Settlements are the result of arm's-length negotiations between experienced counsel who have concluded that the Settlements are fair, reasonable, and adequate. Settlement at this time avoids long and costly additional litigation, including the inevitable appeals after trial. Settlement also provides a huge benefit on behalf of the Class while avoiding the dangers of trial. After the completion of factual discovery, it is the informed opinion of Plaintiffs that the significant risks involved in taking these cases to trial amply justify these Settlements.

102. The presumption in favor of the negotiated settlements in these cases is strengthened by the fact that settlements were reached in an extended mediation supervised by Eric Van Loon, an experienced mediator from JAMS.

103. The parties in these Actions are represented by counsel who are all experienced and well-versed in class action litigation and entertainment law. The negotiations of the proposed Settlements were conducted by these counsel over many sessions with the assistance of a mediator. At all times during the negotiation of the proposed Settlements, counsel for Defendants strenuously denied each and every allegation of wrongdoing and liability and asserted that Defendants had meritorious defenses to Plaintiffs' claims. The settlement negotiations here were intense, hard fought and conducted at arm's-length between experienced and skilled attorneys.

## VIII. CLASS COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND EXPENSES IS FAIR AND REASONABLE

104.    Class Counsel are applying for awards of attorneys' fees inclusive of expenses in the amounts of $1,625,625 in the SME Action and $924,375 in the BMG Action. Although Class Counsel are requesting payment of attorneys' fees and expenses from the separate recoveries in each case, much of the work in the Actions, including almost all of the work done in mediating and finalizing settlement papers, was done in tandem, effectively treating the Actions as a coordinated action. Work billed to one action generally benefited both actions.

105.    Here, the awards requested are for all work performed by Class Counsel in connection with this litigation and in obtaining approval of the $7.95 million in Past Settlement Relief and the Prospective Settlement Relief.

106.    Class Counsel has taken great risk, devoted massive amounts of time, effort, and resources to this case, and has created a common benefit for the Classes. The Past Settlement Relief and the Prospective Settlement Relief obtained for the benefit of the Classes is the result of thousands of hours spent by Class Counsel and the skill and perseverance of Class Counsel in litigating these Actions. It represents a very good result for the Classes in these complex cases, cases that posed a great many obstacles to recovery, including the fact that, at the time the parties reached an agreement in principle to settle these actions, a class had not yet been certified in either action.

107.    Attached hereto as Exhibits D-K are affidavits submitted by Caplan & Ross LLP, Milberg LLP, Probstein, Weiner, and Butler, Law Offices of Thomas A. Cohen, and Labaton Sucharow.[4] These affidavits provide the number of hours worked and the expenses reasonably

---

[4] When these actions commenced in 2006 and 2007, I was a partner at Labaton Sucharow. In June 2007, I left that firm and established my own firm, Caplan & Ross, LLP. While Labaton Sucharow remained co-

incurred by each firm in connection with the Actions through May 31, 2012. Class Counsel sought throughout this litigation to avoid duplication of effort by counsel. Moreover, Class Counsel have reviewed their time records and eliminated certain entries in the exercise of billing judgment. Class Counsel has and expects to spend additional time and expenses in connection with final approval of the Settlements, including addressing inquiries from Class Members, addressing any objections, filing a reply brief in support of final approval, and attending and preparing for the final approval hearing.

108.     As shown in the affidavits submitted by Class Counsel, as of May 31, 2012, Class Counsel have devoted over 6,300 hours to the Actions, for an aggregate lodestar of $2,941,086.95, and also incurred $160,227.71 in unreimbursed out-of-pocket expenses. *See* Exhibits A-K.

109.     Specifically, Class Counsel devoted over 3,500 hours to the prosecution of the SME Action, for an aggregate lodestar of $1,518,187.70, and also incurred $89,910.97 in unreimbursed out-of-pocket expenses. *See* Exhibit B, D, F, H, and J. Class Counsel devoted over 2,800 hours to the prosecution of the BMG Action, for an aggregate lodestar of $1,422,899.25, and also incurred $70,316.74 in unreimbursed out-of-pocket expenses. *See* Exhibits C, E, G, I, and K.

A.     **The Requested Attorneys' Fees and Expenses Represent A Fair and Reasonable Percentage of the Funds Created For the Classes**

110.     The amounts sought for attorneys' fees and expenses ($1,625,625 in the SME Action and $924,375 in the BMG Action) represent a fair and reasonable percentage of the common fund and benefits created for the Classes.

---

counsel for a period of time, in May 2009, Milberg LLP was substituted as co-counsel plaintiff and Labaton Sucharow withdrew at co-counsel at that time.

111. The requested attorneys' fees and expenses represent one-third (33 1/3%) of the $7.65 million in Past Settlement Relief available for Class Members who are parties to a Class Contract under which at least 28,500 total downloads of recordings were sold in the United States on Apple's iTunes Store from inception through December 31, 2010. The amounts awarded by the Court will be payable solely from the $7.65 million in Past Settlement Relief available to Class Members who are parties to Class Contracts under which at least 28,500 total downloads of recordings were sold in the United States on Apple's iTunes Store as of December 31, 2010.

112. Although their efforts also created $300,000 in Past Settlement Relief available to Class Members who are parties to Class Contracts under which fewer than 28,500 total downloads of recordings were sold in the United States on Apple's iTunes Store as of December 31, 2010, Class Counsel are not seeking attorneys' fees and expenses from the $300,000 Past Settlement Relief available to Class Members who are parties to Class Contracts under which fewer than 28,500 total downloads of recordings were sold in the United States on Apple's iTunes Store as of December 31, 2010.

113. Class Counsel's efforts also created the Prospective Settlement Relief.

114. When the benefit of those two additional sources of recovery for Class Members are considered, Class Counsel's requested attorneys' fees and expenses represent an even lower percentage of the total benefits achieved for the Classes.

115. Federal courts in this District and throughout the nation, recognizing the risks and effort generally expended by counsel to obtain favorable results, have awarded attorneys' fees of 33 1/3% of the "gross" recovery in complicated class action cases such as these. Many of these cases treated expenses awards separately. Here, Class Counsel are seeking combined fees and

expenses, so these case would lend even greater support to the requested amounts here, which would include expenses as well.

### B. The Requested Attorneys' Fees and Expenses Are Also Fair and Reasonable Based On A Lodestar/Multiplier Approach

116.    The amounts sought for attorneys' fees and expenses ($1,625,625 in the SME Action and $924,375 in the BMG Action) are also fair and reasonable based on the numbers of hours reasonably billed by Class Counsel multiplied by their appropriate hourly rates.

117.    As shown in the affidavits submitted by Class Counsel, as of May 31, 2012, Class Counsel have spent over 6,300 hours in the prosecution of the Actions, which reflects Class Counsel's commitment to the Actions. Applying Class Counsel's normal current hourly rates to those hours yields an aggregate lodestar of $2,941,086.95. Class Counsel also incurred $160,227.71 in unreimbursed out-of-pocket expenses. *See* Exhibit A.

118.    In the SME Action, as of May 31, 2012, Class Counsel have spent over 3,500 hours to the prosecution of the SME Action. Applying Class Counsel's normal current hourly rates[5] to those hours yields a lodestar amount of $1,518,187.70. *See* Exhibit B.

119.    Subtracting the unreimbursed out-of-pocket expenses of $89,910.97 in the SME Action, the fee portion of Class Counsel's request in the SME Action would be $1,535,714.03. *See* Exhibit B.

120.    In the BMG Action, as of May 31, 2012, Class Counsel have spent over 2,800 hours to the prosecution of the BMG Action. Applying Class Counsel's normal current hourly rates to those hours yields a lodestar amount of $1,422,899.25. *See* Exhibit C.

---

[5] The Supreme Court and the Second Circuit have held that the use of current rates is proper since such rates compensate for inflation and the loss of use of funds. *See Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1984); *N.Y. State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1153 (2d Cir. 1983) (use of current rates appropriate where services were provided within two or three years of application).

121. Subtracting the unreimbursed out-of-pocket expenses of $70,316.74 in the BMG Action, the fee portion of Class Counsel's request in the BMG Action would be $854,058.26. *See* Exhibit C.

122. The combined attorneys' fees requested by Class Counsel are less than a straight lodestar calculation would call for and include no multiplier, meaning that Counsel's requested fees are *less* than their straight time, without any enhancement. In class cases, fees representing multiples above the lodestar have often been awarded to reflect the contingency fee risk and other relevant factors.

## IX. FACTORS TO BE CONSIDERED IN FINDING THE REQUESTED ATTORNEYS' FEES AND EXPENSES ARE FAIR AND REASONABLE

### A. The Time and Labor Expended By Counsel

123. Class Counsel have devoted over 6,300 hours to the prosecution and settlement of these Actions. These efforts were reasonable and necessary to the effective prosecution of the Actions.

### B. Nature and Extent of Litigation

124. As described above, the Actions were aggressively litigated and settled only after the parties had completed merits discovery, extensively briefed Plaintiffs' and Defendants' summary judgment motions and engaged in several mediation sessions and numerous telephone negotiations.

### C. Standing and Expertise of Plaintiffs' Counsel

125. Class Counsel are among the most experienced and skilled practitioners in the class action litigation and entertainment law fields. The experience of Class Counsel is described in their affidavits submitted in support of the application for attorneys' fees and expenses.

## D. Standing and Caliber of Opposing Counsel

126. Defendants are represented by a sophisticated and well-respected law firm that spared no effort in the defense of their clients. In the face of this opposition, Class Counsel nevertheless persuaded Defendants to settle the Actions on terms favorable to the Classes.[6]

## E. The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk, Contingent Cases

127. Class Counsel undertook this litigation on a wholly contingent fee basis. From the outset, Class Counsel understood that they were embarking on a complex, expensive, and probably lengthy litigation with no guarantee of ever being compensated for the investment of time and money the litigation would require. In undertaking that responsibility, Class Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Actions, and that funds were available to compensate staff and the considerable out-of-pocket costs that cases such as these entail.

128. Because of the nature of a contingent-fee practice, not only do contingent litigation firms have to pay regular overhead, but they also have to advance the expenses of litigation. With an average lag time of three to four years or even more for these cases to conclude, the financial burden on contingent counsel is far greater than on a firm that is paid on an ongoing basis.

129. This does not even take into consideration the possibility that there could be no recovery. As discussed above, from the outset, this litigation presented a number of risks and uncertainties that could have prevented any recovery whatsoever. It is wrong to assume that a law firm handling complex contingent litigation such as this always wins. Tens of thousands of

---

[6] In fact, in *Arista Music v. Levinger et al.* (N.D.Ca Case # C 10-03744 WHA), Arista Music asserted that as of the filing of the complaint (August 23, 2010) they had already incurred over two million dollars in attorney's fees and costs in defending itself in the BMG Action alone.

hours have been expended on losing efforts. The factor labeled by the courts as "the risks of litigation" is not an empty phrase.

130.    There are numerous cases where plaintiffs' counsel in contingent cases, after the expenditure of thousands of hours, have received no compensation. Counsel who litigate cases in good faith and receive no fees are often the most diligent members of the plaintiffs' bar. It is only the knowledge by defendants that their counsel and the leading members of the plaintiffs' class action bar are actually prepared to, and will, force a resolution on the merits and go to trial, that permits meaningful settlements in actions such as these.

131.    There are many hard fought lawsuits where, because of the discovery of facts unknown when the case was commenced, or changes in the law during the pendency of the case, or a decision of a judge or jury following a trial on the merits, excellent professional efforts of members of the plaintiffs' bar produced no fee for counsel.

132.    Indeed, there are numerous class action verdicts and opinions affirming dismissals with prejudice, summary judgments and directed verdicts for defendants, wherein class counsel received no payment whatsoever.

133.    When Class Counsel undertook to act as counsel in this matter, it was with the knowledge that we would likely spend thousands of hours of hard work against some of the best defense lawyers in the United States with no assurance of ever obtaining any compensation for our efforts, or even for the overhead of our offices (which is an increasingly substantial consideration). We were aware that the only way we would be compensated was if we achieved a successful result. The benefits conferred by the Settlements are noteworthy in that Past Settlement Relief worth $7.95 million and Prospective Settlement Relief was obtained for the

Classes, despite the existence of substantial risks and the vigorous defense mounted by Defendants.

### F. The Requested Fee in Relation to the Settlement

134. As set forth in the accompanying memorandum in support of the motions for attorneys' fees and expenses, awards of attorneys' fee and expenses in excess of 33 1/3% or more of the amount recovered are not unusual in common fund class actions.

### G. Public Policy Considerations

135. Public policy considerations strongly favor the requested fee award. The relatively small claims of many of the members of the Classes here, when taken separately, would not justify the expense of litigation. In such circumstances, courts in this Circuit have recognized that private attorneys should be encouraged to take the risks required to represent those who would not otherwise be protected from socially undesirable activities. However, as a practical matter, lawsuits like this one can be maintained only if competent counsel can be obtained to prosecute them. This will occur if courts award reasonable and adequate compensation for counsel's services where successful results are achieved.

## X. THE REQUESTED SERVICE AWARDS FOR THE TWO CLASS REPRESENTATIVE PLAINTIFFS ARE FAIR AND REASONABLE

136. Courts have, with some frequency, held that a successful Class action plaintiff, may, in addition to his or her allocable share of the ultimate recovery, apply for and, in the discretion of the Court, receive an additional award, termed an incentive award. The Plaintiffs each respectfully request awards in the amount of $15,000 ($30,000 in the aggregate) to compensate them for their time, expenses, and burdens they have incurred during the more than five years of preparing for and prosecuting this litigation. The amounts awarded by the Court

shall be payable by Defendants in cash and will not be deducted from the Past Settlement Relief available to Class Members.

137. During the course of this litigation, the two Plaintiffs furthered the prosecution of this action on behalf of the Classes by, among other things, aiding the investigation and preparation of the complaint and amended complaint, searching for responsive documents, sitting for depositions, reviewing briefings, consulting in the settlement and mediation processes, and otherwise assisting Class Counsel in analyzing the claims, defenses and issues in this action. *See* Exhibits L and M. As such, it is respectfully submitted that Plaintiffs are should be awarded incentive awards for their contributions to these Actions.

## XI.   CONCLUSION

138. For the reasons set forth above and in the accompanying memorandums in support of the proposed Settlements and in support of the attorneys' fees and expenses requested, Class Counsel respectfully submits that the Settlements and the Plans of Allocation are fair, reasonable and adequate and should be approved and the application for awards of attorneys' fees and reimbursement of expenses and service awards to the named plaintiffs are also fair and reasonable and should be granted.

Dated: New York, New York
       June 14, 2012

I declare under penalty of perjury that the foregoing is true and correct

_____
Brian D. Caplan